**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KAREN BRAMAN,**

                                        **Plaintiff,**

        **vs.**                                                    **1:23-CV-1598**
                                                                   **(MAD/PJE)**

**PUBLIC EMPLOYER RISK MANAGEMENT**
**ASSOCIATION, INC., and MARY BETH WOODS,**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**GIORDANO LAW OFFICES PLLC**             **CARMEN S. GIORDANO, ESQ.**
226 Lenox Avenue
New York, New York 10027
Attorney for Plaintiff

**ABRAMS FENSTERMAN**                      **JOANNA M. TOPPING, ESQ.**
**FENSTERMAN, et al.**                     **ANDREW L. GOODMAN, ESQ.**
81 Main Street
Suite 306
White Plains, New York 10601
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Karen Braman commenced this action through the filing of a complaint on

December 18, 2023, alleging her previous employers, Defendants Public Employer Risk

Management Association, Inc. ("PERMA") and Mary Beth Woods, discriminated and retaliated

against Plaintiff on the basis of her age, sex, and disability.  *See* Dkt. No. 1.  At the time Plaintiff

filed her amended complaint, she was 59 years old.  *See* Dkt. No. 40 at ¶ 2.  She has osteoarthritis

1

and fibromyalgia. *See id.* at ¶ 32. Plaintiff brings claims under the Age Discrimination in Employment Act, Title VII of 42 U.S.C. § 2000e, the Americans with Disabilities Act, New York State Human Rights Law § 290, *et seq.*, and Albany Omnibus Human Rights Law.

Presently before the Court is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), in which Defendants argue that Plaintiff's complaint is barred by judicial estoppel, she lacks standing to pursue the action, and she has failed to state certain claims. *See* Dkt. Nos. 25, 26, 27. Plaintiff responded in opposition, *see* Dkt. No. 35, and Defendants replied. *See* Dkt. No. 37. Plaintiff subsequently amended her complaint. *See* Dkt. No. 40. With the Court's permission, Defendants filed a supplemental memorandum of law addressing Plaintiff's amended complaint. *See* Dkt. No. 41.

For the following reasons, Defendants' motion for judgment on the pleadings is granted.

## II. BACKGROUND[1]

### A.    Factual Background

Plaintiff alleges that she was hired in 1994 by PERMA's predecessor company, MMA Consulting Group. *See* Dkt. No. 40 at ¶¶ 6-7. She was hired as an administrative assistant. *See id.* at ¶ 6. PERMA absorbed MMA in 2019, but Plaintiff remained "in precisely the same position, performing the same duties, and nothing changed internally at her office except the software system." *Id.* at ¶ 7. PERMA is a not-for-profit company which manages workplace safety and workers' compensation claims. *See id.* at ¶¶ 8-9. It has approximately seventy-five employees. *See id.* at ¶ 10. In the early 2000s, Plaintiff was promoted to Vice President of the

---

[1] The parties agree that the Court should review Defendants' motion in light of Plaintiff's amended complaint. *See* Dkt. No. 41 at 4; *see also* Dkt. No. 36 at 2-3.

"Member Services Department, with responsibilities that included member satisfaction, education programs, conferences, board membership, and retention." *Id.* at ¶ 11.

Plaintiff alleges that she performed her job well and received good annual reviews. *See id.* at ¶ 12. Plaintiff managed the construction of PERMA's headquarters building and created Member and Broker portals for the company. *See id.* at ¶¶ 13-15. Plaintiff also oversaw the company's "Personal Protective Equipment (PPE) program for membership, assuring Company compliance with state and federal laws and regulations" during the COVID-19 pandemic. *Id.* at ¶ 16.

Defendant Woods became Plaintiff's manager in or around January of 2022. *See id.* at ¶¶ 3, 20. Woods began excluding Plaintiff from meetings and delegated Plaintiff additional tasks that were typically handled by other staff members. *See id.* at ¶¶ 27-28. Plaintiff alleges that Woods assigned her "busy tasks" and kept her from doing things she had done for the "past two decades." *Id.* at ¶¶ 27-29. In September 2022, Woods presented a document which broke down the staff members into age groups. *See id.* at ¶ 30. In October, Woods brought Plaintiff and Johanna Zbytniewski, a 50-year-old female employee, into a meeting, and told the two women that the younger employees "look at you and feel like there is no place to go." *Id.* at ¶ 31.

Plaintiff contends Woods' "ruthless conduct evinced a pattern of discriminatory treatment towards PERMA's older, more senior, and female employees." *Id.* at ¶ 24. Plaintiff states that this is evident because "[w]hile Plaintiff and her only direct report Johanna Zbytniewski . . . were terminated by Woods, three other younger reports[] (two females in their thirties and one male in his early forties) in the same department that was 'eliminated' were absorbed within another department to perform the same functions." *Id.* at ¶ 23 (footnote omitted). "In addition to Plaintiff and Zbytniewski, at least two other currently employed senior employees in their late

fifties had complained about similar misconduct by Woods, including marginalization, setting up, and sabotaging in an orchestrated effort to eliminate these other older (and female) employees under her control." *Id.* at ¶ 25.

Plaintiff has osteoarthritis in her left hip which causes trochanteric bursitis, and fibromyalgia. *See id.* at ¶ 32.  She alleges that PERMA knew or should have known about her disability. *See id.* at ¶ 33.  In 2017, Plaintiff submitted a reasonable accommodation request for a standing desk. *See id.* at ¶ 34.  Plaintiff discussed her condition with her colleagues. *See id.*  Her condition causes pain, stiffness, fatigue, and limitations in her range of motion. *See id.* at ¶ 35.  This substantially limits her abilities in walking, sitting, standing, and sleeping. *See id.* at ¶ 38.  However, Plaintiff avers that "at all relevant times Plaintiff was able and more than qualified to perform the essential functions of her job with or without the reasonable accommodation." *Id.* at ¶ 36.

In December 2022, PERMA's department heads were scheduled to visit a PERMA member in Long Island, New York. *See id.* at ¶ 39.  Woods told everyone to stop for lunch at a mall in Poughkeepsie, New York. *See id.*  Plaintiff alleges that Woods led the group through the mall and "briskly walked to the very end of the large mall." *Id.*  Plaintiff had issues keeping up with the group because of her arthritis. *See id.* at ¶ 40.  While Plaintiff was behind the group, Woods asked, "What's wrong with you?  Is there something wrong with your back?" *Id.*  Woods glared at Plaintiff until Plaintiff explained, "Well, my hips are kind of hurting me.  I have some arthritis going on, and it flares up depending on the weather." *Id.* at ¶ 41.  Woods replied, "Oh," and walked away. *See id.*  After that trip, Plaintiff informed Woods about her arthritis. *See id.* at ¶ 42.  Woods then "excluded Plaintiff from all subsequent site visits and client meetings, further

4

sidelining and isolating her, making it impossible for her to properly carry out her responsibilities." *Id.*

Plaintiff alleges that Woods encouraged drinking alcohol during work-related events and invited the younger, male staff members to attend site visits. *See id.* at ¶¶ 44-45. Plaintiff was not invited to those visits. *See id.* at ¶ 45. Plaintiff contends Woods acted like "one of the boys" on the trips. *Id.* "It became routine that Woods would invite all the male employees and not one female employee to important meetings, gatherings, and events. Woods took the male managers and directors with her out to lunch, to conferences, on day trips, site visits, and overnights, excluding Plaintiff and other females." *Id.* at ¶ 48. Woods continued to exclude Plaintiff from meetings and assign Plaintiff menial and time-consuming tasks. *See id.* at ¶¶ 50-53.

Plaintiff was "[c]oncerned about the obvious mistreatment and continuing effort to derail and sabotage her, Plaintiff expressed concern for her job to Woods and asked her directly, 'Are there any organizational changes coming down pipeline that I should be aware of? I have the feeling that something is happening here. Should I be concerned about my job?'" *Id.* at ¶ 55. Woods told Plaintiff she had "nothing to worry about." *Id.* at ¶ 56.

On January 6, 2023, Woods asked Plaintiff to call her. *See id.* at ¶ 57. During the call, Woods analyzed Plaintiff's department data. *See id.* Plaintiff alleges that such conduct violates PERMA's rules on performance reviews because it was not pre-planned. *See id.* at ¶ 58. Plaintiff told Woods she was not prepared to talk at that time, but Woods continued the conversation. *See id.* at ¶ 59. Plaintiff contends that the numbers on the report Woods used to criticize Plaintiff's performance were fabricated and inaccurate. *See id.* at ¶ 60.

Later in January 2023, Woods asked another staff member to redo Plaintiff's work. *See id.* at ¶ 62. In February, other staff members began ignoring Plaintiff. *See id.* at ¶ 63. Woods also

required Plaintiff and her team to come into the office during inclement weather, but Woods and other managerial staff were not required to do the same. *See id.* at ¶¶ 64-67.

On January 23, 2023, during a virtual meeting, a male colleague commented on Plaintiff looking "awful," to which Plaintiff explained she was sick. *Id.* at ¶ 70. That same day, Plaintiff spoke with the Vice President of Human Resources, Jackie Hennessey, about her experiences with Woods. *See id.* at ¶ 71-73. Hennessey stated she did not know about Plaintiff's earlier performance review. *See id.* at ¶ 74.

On February 23, 2023, Plaintiff and Woods had a one-on-one meeting in which Plaintiff attempted to discuss the previous, spontaneous review. *See id.* at ¶ 68. Plaintiff also sought guidance from Woods as to how Plaintiff could improve her performance. *See id.* Woods said she did not know. *See id.* Woods also blamed Plaintiff for the cancellation of two work events. *See id.* at ¶ 69.

On March 15, 2023, the male colleague who commented on Plaintiff's appearance left a bottle of wine on Plaintiff's desk because of his "faux pas." *Id.* at ¶ 77. Woods excluded Plaintiff from meetings that her male colleagues were invited to on February 28 and March 1, 2023. *See id.* at ¶ 78. Plaintiff alleges that during an April 13, 2023, meeting, Woods undermined Plaintiff's authority with respect to her job and blamed Plaintiff for conduct that had already been resolved. *See id.* at ¶ 79. On April 20, 2023, Plaintiff again asked Woods about the security of her job and Woods told Plaintiff she had "nothing to worry about." *Id.* at ¶ 80. On May 13, 2023, Plaintiff observed a photo online of a registered nurse with her middle finger raised and she asked Zbytniewski to remove the photo from PERMA's conference application. *See id.* at ¶ 81. Plaintiff informed Woods of the issue, but Woods did not respond. *See id.*

On May 15, 2023, Woods notified Plaintiff that three younger colleagues in Plaintiff's

department were going to be "absorbed" by another department and that Plaintiff and Zbytniewski

were being terminated. *See id.* at ¶ 82. Plaintiff was then locked out of PERMA's systems. *See*

*id.* Plaintiff alleges that her termination was discriminatory and retaliatory and resulted in

economic and non-economic damages. *See id.* at ¶ 92.

**B.    Procedural History**

On September 28, 2018, Plaintiff filed for Chapter 13 bankruptcy in the U.S. Bankruptcy

Court for the Northern District of New York. *See In re Braman*, No. 18-BK-11720 (N.D.N.Y.).[2]

On July 25, 2023, Plaintiff filed a charge of discrimination with the with the Equal

Employment Opportunity Commission ("EEOC"), alleging violations of the ADEA, Title VII,

and the ADA. *See* Dkt. No. 40 at ¶ 93. On October 19, 2023, Plaintiff filed a motion in

bankruptcy court seeking to convert her Chapter 13 bankruptcy petition to a Chapter 7 case. *See*

*In re Braman*, No. 18-BK-11720, Dkt. No. 59. Plaintiff informed the bankruptcy court that she

had been terminated from PERMA. *See id.* at ¶ 5. The bankruptcy court granted Plaintiff's

motion on October 20, 2023. *See id.* at Dkt. No. 63.

Plaintiff then filed her complaint in this Court on December 18, 2023. *See* Dkt. No. 40 at

¶ 94. The bankruptcy court discharged Plaintiff's claim on February 2, 2024. *See In re Braman*,

No. 18-BK-11720, Dkt. No. 72. The EEOC issued a Notice of Right to Sue on June 5, 2024. *See*

Dkt. No. 40 at ¶ 95. Defendants filed an answer to Plaintiff's complaint in this action on March 5,

2024. *See* Dkt. No. 12. The bankruptcy court issued a final decree closing Plaintiff's bankruptcy

---

[2] "[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law").

action on March 15, 2024.  *See In re Braman*, No. 18-BK-11720, Dkt. No. 77.  Defendants then

filed an amended answer on March 18, 2024, asserting, in part, that Plaintiff failed to disclose this

cause of action in her bankruptcy case.  *See* Dkt. No. 15.

### III. DISCUSSION

**A.    Motion to Dismiss Standard**

"[I]n deciding a Rule 12(c) motion, we apply the same standard as that applicable to a

motion under Rule 12(b)(6) . . . ."  *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010)

(quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)).  A motion to dismiss for failure

to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal

sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir.

2007) (citation omitted).  In considering the legal sufficiency, a court must accept as true all well-

pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor.  *See ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This

presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is

generally limited to the facts presented in the pleading, the court may consider documents that are

"integral" to that pleading, even if they are neither physically attached to, nor incorporated by

reference into, the pleading.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)

(quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled

to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).  Under this

standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the

speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

When a party moves to dismiss a claim pursuant to Rule 12(b)(1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted).  For purposes of such a motion, "the allegations in the complaint are not controlling . . . and only uncontroverted factual allegations are accepted as true. . . ." *Id.* (internal citations omitted).  Both the movant and the pleader are permitted to use affidavits and other materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  "Furthermore, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Gunst v. Seaga*, No. 05-CV-2626, 2007 WL 1032265, *2 (S.D.N.Y. Mar. 30, 2007) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)); *see also State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007) (holding that, in a motion to dismiss for lack of subject matter jurisdiction, a court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits").

In deciding a motion to dismiss, the court may consider "documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken[.]" *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted). "Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)). "Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned." *Bentley v. Dennison*, 852 F. Supp. 2d 379, 382 n.5 (S.D.N.Y. 2012).

**B.    Analysis**

*1. Judicial Estoppel*

Defendants argue Plaintiff is judicially estopped from bringing her claims before this Court because she did not disclose the claims in her bankruptcy case. *See* Dkt. No. 27 at 16-20. Plaintiff argues that because her causes of action arose after she filed for bankruptcy, the claims are separate property, which are not required to be included in her bankruptcy estate. *See* Dkt. No. 35 at 16-20.

"'The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'" *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 271 (2d Cir. 2019) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)). "Judicial estoppel functions to 'protect the integrity of the judicial process by prohibiting parties from deliberately

changing positions according to the exigencies of the moment.'" *Id.* at 272 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)).  "Thus, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Id.* (quotations omitted).

"Judicial estoppel is properly invoked where: (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding." *Id.* (citation omitted).  The Second Circuit has "also often, but not always, required a showing that the party asserting the two inconsistent positions would derive an unfair advantage against the party seeking estoppel." *Id.* (citations omitted). "Finally, '[b]ecause the doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain.'" *Id.* (quoting *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014)).

"In sum, '[j]udicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits.'" *Id.* (quotation omitted).  "Moreover, 'there must be a true inconsistency between the statements in the two proceedings.  If the statements can be reconciled there is no occasion to apply an estoppel.'" *Id.* (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d Cir. 1997)).  "Finally, the 'exact criteria for invoking judicial estoppel will vary based on specific factual contexts.'" *Id.* (quotation omitted).

"Judicial estoppel is regularly invoked in the bankruptcy context; specifically, '[j]udicial estoppel will prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'" *Id.* (quotation omitted). "Moreover, whether a party is advancing inconsistent claims in the bankruptcy context 'is largely informed by the bankruptcy court's treatment of those claims.'" *Id.* (quotation omitted). "We have emphasized that '[d]etermination of the ownership of assets is at the core of the bankruptcy process. . . . It is therefore crucial, both for the sake of finality and the needs of debtors and creditors, that claims to ownership of various assets be determined in the bankruptcy proceedings.'" *Id.* (quotation omitted).

"Bankruptcy petitioners have an affirmative obligation to disclose all assets to the bankruptcy court, including all causes of action that can be brought by the debtor." *Coffaro v. Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010) (citing 11 U.S.C. §§ 541(a)(1), 521(a)(1)). "[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008). "'[I]f the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then it is a "known" cause of action such that it must be disclosed.'" *In re Solutia, Inc.*, 653 B.R. 99, 124 (Bankr. S.D.N.Y. 2023) (citing *In re Residential Cap., LLC*, 519 B.R. 890, 906 (Bankr. S.D.N.Y. 2014); *In re Coastal Plains*, 179 F.3d 197, 208 (5th Cir. 1999)). "A debtor's disclosure is 'essential to the proper functioning of the bankruptcy system,' and 'the Bankruptcy Code severely penalizes debtors who fail to disclose assets.'" *Id.* (quoting *Chartschlaa*, 538 F.3d at 122). "But a debtor does not need to disclose 'unknown' causes of action. . . . ." *Id.* (quotations omitted).

The Bankruptcy Code dictates that a bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541(a)(1) (emphasis added). "[S]ection 348(a) establishes the general rule that, in a converted case, the dates of the filing, the commencement of the case and the order for relief remain unchanged by the conversion." *In re Bell*, 225 F.3d 203, 213 (2d Cir. 2000). However, there is an exception in § 348 of the Bankruptcy Code which states that "[i]f the debtor converts a case under chapter 13 of this title to a case under another chapter under this title in bad faith, the property of the estate in the converted case shall consist of the property of the estate as of the date of conversion." 11 U.S.C. § 348(f)(2).

Plaintiff filed her Chapter 13 bankruptcy petition on September 28, 2018. *See In re Braman*, No. 17-BK-11720, Dkt. No. 1. When she filed her petition, she signed a document indicating that she had "no" "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment[.] Examples: Accidents, employment disputes, insurance claims, or rights to sue." *Id.* at 13. Plaintiff's Chapter 13 plan was confirmed on July 17, 2019. *See id.*, Dkt. No. 24. Plaintiff was terminated on May 15, 2023. *See* Dkt. No. 40 at ¶ 82. Insofar as Plaintiff alleges that she suffered adverse employment actions and a hostile work environment prior to her termination, the conduct occurred after Defendant Woods was appointed as Executive Director in January 2022. *See id.* at ¶ 20. She alleges that throughout her employment, she repeatedly asked Defendant Woods if her job was safe, and she was reassured that it was. *See id.* at ¶¶ 55, 85. Thus, Plaintiff had no way of knowing about any potential employment-related claims in 2018.

The issue then becomes whether the conversion of Plaintiff's Chapter 13 bankruptcy to a Chapter 7 case in October 2023—five months after her termination—mandated disclosure of Plaintiff's claims as bankruptcy estate property.

Plaintiff was terminated on May 15, 2023. *See* Dkt. No. 40 at ¶ 82. Plaintiff filed an EEOC charge on July 25, 2023. *See id.* at ¶ 93. Plaintiff was represented by counsel at that time, who is also counsel of record for Plaintiff in this action. *See* Dkt. No. 26-7 at 1. In her EEOC charge, Plaintiff indicated that the description of the events she believed were discriminatory were "more fully described and detailed in *the attached draft federal complaint*, which is subject to further revision and *will be filed* upon receipt of a Notice of Right to Sue." *Id.* (emphasis added). Plaintiff "requested that the EEOC issue a Notice of Right to Sue *so that [she] may pursue [her] claims in federal court*." *Id.* at 3 (emphasis added). Plaintiff declared under penalty of perjury that the information was accurate, and she signed and dated the document on July 24, 2023. *See id.*

Plaintiff moved in bankruptcy court to convert her Chapter 13 case to a Chapter 7 petition on October 19, 2023. *See In re Braman*, No. 18-BK-11720, Dkt. No. 59. In her motion, Plaintiff noted that she had been terminated. *See id.* at ¶ 5. She did not indicate an intention to sue anyone. *See id.* The bankruptcy court granted Plaintiff's motion and converted her case on October 20, 2023. *See id.* at Dkt. No. 63. She filed her initial complaint in this case on December 18, 2023. *See* Dkt. No. 1.

Defendants first argue that Plaintiff's claims in this action belong to her bankruptcy estate because she moved to convert her Chapter 13 bankruptcy case to a Chapter 7 petition in bad faith. *See* Dkt. No. 27 at 16. They also contend that Plaintiff is judicially estopped from bringing her claims in this Court because "plaintiff's assertion that she 'has a claim for discrimination,

14

harassment, and retaliation . . . is clearly inconsistent with [her] representation to the bankruptcy court that no such claim existed.'" *Id.* at 17 (quoting *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 599 (S.D.N.Y. 2013)).

Plaintiff acknowledges the bad faith exception in § 348 of the Bankruptcy Code, but she argues that "[a] party in interest would need to file a motion in the underlying bankruptcy case seeking a determination by the Court that the conversion was made in bad faith. No such motion has been filed by any party in interest in the Bankruptcy Court in this case." Dkt. No. 35 at 19. She asserts that "said finding would need to be made prior to the entry of Debtor's discharge. . . . No party-in-interest moved to challenge Debtor's discharge within the statutory timeframe, nor was an extension of time to do so sought. As such, it is *res judicata* that Debtor's Chapter 7 conversion was inherently made in good faith, and same cannot be collaterally attacked now." *Id.* (emphasis omitted) (citing FED. R. BANKR. P. 4004(a)).

In Defendants' reply, they argue that Plaintiff's contentions are erroneous because "FED. R. BANKR. P. 4004(a) . . . merely sets out the procedure for a creditor to raise an objection to discharge[,] . . . [and i]t would be particularly absurd to hold that a debtor who fails to disclose an asset gets to keep that asset for herself merely because she hid it from her creditors long enough to prevent any objection." Dkt. No. 37 at 9. Defendants assert Plaintiff did not meaningfully dispute Defendants' argument that her conversion was in bad faith. *See id.* at 7. Defendants note that months prior to seeking conversion of her bankruptcy action, Plaintiff "had knowledge of her potential causes of action, as she had already retained counsel, drafted a complaint and expressed her intent to sue at the first available opportunity in her EEOC charge . . . ." *Id.*

First, to the extent Plaintiff's response to Defendants' motion can be construed as arguing that this Court does not have jurisdiction to determine what constitutes her bankruptcy estate

based on the "bad faith" issue, *see* Dkt. No. 35 at 19, Plaintiff has previously admitted that "this Court has jurisdiction under 28 U.S.C. § 1334(a) and is qualified to decide the issue." Dkt. No. 31 at 2. Plaintiff also presents no case law which supports her assertion that a motion regarding bad faith is required to first be filed in bankruptcy court. *See* Dkt. No. 35 at 19. The Court will, therefore, review the merits of the issues raised by Defendants.

"'Failure to list an accrued cause of action as an asset during bankruptcy proceedings can trigger judicial estoppel implications. Upon filing of a bankruptcy petition, all assets of the debtor, including potential causes of action, become an asset of the bankruptcy estate[.]'" *McKinley v. Everest Receivable Servs., Inc.*, No. 19-CV-1289, 2022 WL 446407, *6 (W.D.N.Y. Feb. 14, 2022) (quoting *Harms v. Cigna Ins. Cos.*, 421 F. Supp. 2d 1225, 1228 (D.S.D. 2006)). "'The rationale for these decisions is that the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets.'" *Amash v. Home Depot U.S.A., Inc.*, 503 B.R. 232, 237 (N.D.N.Y. 2013) (quoting *Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996)); *see In re Residential Cap., LLC*, No. 12-BK-12020, 2015 WL 2375979, *8 (Bankr. S.D.N.Y. May 15, 2015) (concluding that the plaintiff was estopped from bringing his claims because the debtor had sufficient knowledge of potential claims and failed to include the claims in his bankruptcy schedules and he was represented by counsel).

Section 348(f)(2) of the Bankruptcy Code does not define "bad faith." *See In re Malone*, No. 10-BK-4088, 2011 WL 1541289, *3 (Bankr. D. Neb. Apr. 21, 2011) (explaining that this "leav[es] courts to fashion their own definitions"). Courts have opined that "[b]ad faith 'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplated a state of mind affirmatively operating with furtive design or ill will.'" *In re Doetsch*, No. 04-BK-63998, 2007 WL 2702645,

*3 (Bankr. N.D.N.Y. Sept. 12, 2007) (quoting *In re Siegfried*, 219 B.R. 581, 584 (Bankr. D. Colo. 1998)); *see also In re Smith*, No. 10-BK-60849, 2012 WL 43647, *2 (Bankr. N.D. Ohio Jan. 9, 2012).  However, "'[n]ot all conversions from Chapter 13 to Chapter 7 with an intervening inheritance will constitute a bad faith conversion.  The facts of each case must be examined.'" *In re Doetsch*, 2007 WL 2702645, at *3 (quoting *In re Messer*, No. 96-BK-550617, 2000 WL 33673748, at *4 n.4 (Bankr. M.D.N.C. Nov. 22, 2000)).

"[C]ourts have declined to impose this estoppel if there was an inadvertent failure to disclose from lack of knowledge of the facts for the claim or the lack of a motive to conceal the claim.'" *McKinley*, 2022 WL 446407, at *6 (quoting *Black v. Buffalo Meat Serv., Inc.*, No. 15-CV-49, 2021 WL 2043006, *17 (W.D.N.Y. May 21, 2021)) (additional quotation omitted).  "The courts that have addressed this issue have concluded that the 'failure to disclose assets will only be deemed inadvertent or due to mistake when either the debtor has no knowledge of the claims or no motive to conceal the claims.'" *Amash*, 503 B.R. at 237 (quoting *Ibok v. Siac-Sector Inc.*, No. 05-CV-6584, 2011 WL 293757, *7 (S.D.N.Y. Feb. 2, 2011)); *see Pealo v. AAF McQuay, Inc.*, 140 F. Supp. 2d 233, 237 (N.D.N.Y. 2001) ("[P]laintiff admits that he did not disclose the pendency of his EEOC charge to the bankruptcy court.  However, it also seems that plaintiff's failure was inadvertent as he relied upon his bankruptcy attorney to make the required disclosures. Furthermore, current counsel has taken corrective action by reopening plaintiff's estate and obtaining the Bankruptcy Court's permission to proceed with the instant claims").

Plaintiff argues that she had no motive to conceal her claims because the damages she alleges in this case "are far in excess of the $24,773.75 ultimately discharged" in bankruptcy. Dkt. No. 35 at 19.  This does not establish an absence of bad faith because, assuming Plaintiff would be awarded an amount "far in excess of the $24,773.75" through this case, then part of that

award may have been required to pay some, if not all, of her remaining debt.  This potentially gives Plaintiff motive to conceal her claims.

However, the Court cannot conclude as a matter of law, at this juncture, that Plaintiff converted her bankruptcy case in bad faith or that her claims are property of her bankruptcy estate.  The Court likewise cannot determine on the present record whether Plaintiff is judicially estopped from bringing her claims.

As to bad faith, Plaintiff signed a document in 2018 indicating that she had "no" "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment[.]" *In re Braman*, No. 18-BK-11720, Dkt. No. 1 at 13.  There is no dispute that Plaintiff was unaware of her potential claims on that date because she was not terminated from PERMA until 2022.  It is also true that Plaintiff filed an EEOC charge on July 25, 2023.  *See* Dkt. No. 40 at ¶ 93.  Plaintiff was represented by counsel at that time, who is also counsel of record for Plaintiff in this action. *See* Dkt. No. 26-7 at 1.  In her EEOC charge, Plaintiff indicated that she had a "draft federal complaint, which is subject to further revision and will be filed upon receipt of a Notice of Right to Sue." *Id.*  Plaintiff submitted an amended schedule in bankruptcy court, which was signed on October 19, 2023, and stated that "Debtor has been laid off since May, 2023.  Is actively searching for work.  Debtor will supplement income utilizing retirement withdrawal's unless and until new employment is secured." *In re Braman*, No. 18-BK-11720, Dkt. No. 60 at 4.  She stated that she "has no ability to pay the Chapter 13 plan as confirmed." *Id.* at Dkt. No. 58 at ¶ 7.

Although Plaintiff did not indicate an intention to file her present claims in her amended schedule, Plaintiff's EEOC attorney and her attorney of record in this action were not her bankruptcy counsel.  Neither party has provided any information, via declarations or otherwise, as to whether Plaintiff spoke with her bankruptcy attorney about her anticipated discrimination

claims. Her amended schedule also does not appear to provide a spot on the form to indicate whether Plaintiff had any potential claims. *See In re Braman*, No. 18-BK-11720, Dkt. No. 60. Plaintiff did not take any action to notify the bankruptcy court about her claims, but the Court is unaware whether Plaintiff was told she did not need to inform the bankruptcy Court about her impending lawsuit, or if she knew and did not care.

For these reasons, the Court is also unable to determine whether Plaintiff is judicially estopped from bringing her claims because there is no definitive evidence that Plaintiff had a motive to conceal her claims or that she was successful in providing a contradictory statement to the bankruptcy court. To determine whether judicial estoppel should be applied, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled[.]'" *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation omitted). "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' . . . and thus poses little threat to judicial integrity." *Id.* at 750-51 (internal quotation omitted). There is presently no evidence in the record sufficient for the Court to determine whether Plaintiff's position in bankruptcy court was "successful."

There is nothing in the bankruptcy court's conversion order which indicates that it relied on a statement from Plaintiff that she did not have any potential claims in making its decision. *See In re Braman*, No. 18-BK-11720, Dkt. No. 63. Similarly, the bankruptcy court's decision to discharge Plaintiff as the debtor says nothing about potential claims or a lack thereof. *See id.*, Dkt. No. 72. The Court is left with nothing but hypotheticals as to whether Plaintiff's failure to disclose her lawsuit to the bankruptcy court caused her to be "successful" in bankruptcy. It is

possible that if she disclosed her claims, the bankruptcy trustee would have done nothing; thereby likely ending the bankruptcy proceeding in the same place. Even if the bankruptcy trustee decided to pursue the claims, there is no guarantee that any creditors would have taken any action in relation to the bankruptcy case. Given these uncertainties, the Court cannot conclude as a matter of law that the extraordinary remedy of judicial estoppel must apply. It is for this same reason that the Court cannot grant Defendants' motion on the issue of standing at this juncture of the case.

"When . . . a debtor fails to list a claim in h[er] bankruptcy schedules, that claim remains the property of the bankruptcy estate even after discharge, and the debtor lacks standing to pursue it." *Coffaro*, 721 F. Supp. 2d at 148 (citing 11 U.S.C. §§ 521(a)(1), 541). Indeed, "'[c]ourts have consistently held that only the trustee and not a debtor has standing to pursue causes of action that belong to the bankruptcy estate.'" *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 375 B.R. 719, 725 (S.D.N.Y. 2007) (quoting *Hopkins v. Foothill Mt., Inc.*, 346 B.R. 294, 304 (Bankr. E.D.N.Y. 2006)). "As explained by the Second Circuit, '[w]hile properly scheduled estate property that has not been administered by the trustee normally returns to the debtor when the bankruptcy court closes the case, undisclosed assets automatically remain property of the estate after the case is closed.'" *In re Arana*, 456 B.R. 161, 170 (Bankr. E.D.N.Y. 2011) (quoting *Chartschlaa*, 538 F.3d at 122).

As the Court did not conclude as a matter of law that Plaintiff acted in bad faith or that her claims are property of her bankruptcy estate, the Court cannot determine whether it is Plaintiff, the Chapter 7 trustee, or both, that have standing to bring her claims. The Court, therefore, denies those aspects of Defendants' motion to dismiss. However, Defendants may raise these issues,

again, at a later stage of the case because "[a] party may challenge subject matter jurisdiction at any time." *United States v. Assa Co.*, 934 F.3d 185, 188 (2d Cir. 2019)

### 2. Merits of Plaintiff's Claims

Plaintiff brings claims for discrimination and retaliation based on her sex, disbaility and age. *See generally* Dkt. No. 40. Defendants move to dismiss Plaintiff's sex and disability discrimination claims and her retaliation claims. *See* Dkt. No. 27 at 21-25. Specifically, Defendant argue Plaintiff has not plausibly alleged (1) a nexus between her sex and disability and her termination; and (2) a nexus between any protected activity and her termination. *See id.* Plaintiff argues the contrary. *See* Dkt. No. 35 at 20-29.

### a. Discrimination

"Claims of employment discrimination under Title VII and the ADA are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Cherry v. New York City Hous. Auth.*, 564 F. Supp. 3d 140, 164 (E.D.N.Y. 2021) (citing *Mills v. S. Conn. State Univ.*, 519 Fed. App'x. 73, 74-75 (2d Cir. 2013); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). Additionally, "[c]laims of gender- and disability-based discrimination under the NYSHRL are analyzed under the same standard as gender and disability discrimination claims under Title VII." *Id.*; *see also Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 417 (S.D.N.Y. 2018); *Brown v. 820 River St., Inc.*, No. 108-CV-0130, 2009 WL 2461080, *2 n.4 (N.D.N.Y. Aug. 10, 2009).

"Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination by showing that '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Clawson v. City of Albany Dep't of Fire & Emergency*, No.

1:20-CV-1449, 2023 WL 2456065, *5 (N.D.N.Y. Mar. 9, 2023), *aff'd*, No. 23-482, 2024 WL 1044531 (2d Cir. Mar. 11, 2024) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).  "'Once an employee makes a *prima facie* case of [discrimination], the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions.'"  *Id.* (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).  "If the employer can provide such a reason, 'the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination.'"  *Id.* (quotation omitted).  "To rebut the articulated justification for the adverse action, 'the plaintiff must show "both that the reason was false, and that discrimination was the real reason."'"  *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993)). (additional quotation omitted).  "[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)) (quotation marks omitted).

"An inference of discrimination may be supported at this stage by showing more favorable treatment of an employee not in the plaintiff's protected class."  *Pollock v. Shea*, 568 F. Supp. 3d 500, 509-10 (S.D.N.Y. 2021) (citing Littlejohn v. City of N.Y., 795 F.3d 297, 312-13 (2d Cir. 2015)).  "[A]t the motion to dismiss stage, the question is not whether a plaintiff is likely to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to nudge[ ] their claims across the line from conceivable to plausible."  *Hill v. Soar Restaurants II LLC*, No. 5:23-CV-0396, 2024 WL 1257415, *7 (N.D.N.Y. Mar. 25, 2024) (quoting *Buon v. Spindler*, 65 F.4th 64, 85 (2d Cir. 2023)) (quotation marks and additional quotation omitted).

Here, Defendants argue that Plaintiff has failed to state a sex-based discrimination claim because Plaintiff is a female and was fired by Woods, who is also a female, and other female employees retained their jobs when Plaintiff was terminated.  *See* Dkt. No. 27 at 22.

Plaintiff is correct in her response, insofar as she states that "[t]he Supreme Court has 'rejected any conclusive presumption' that an employer or, presumably, his agents, will not discriminate against members of their own race or gender." *Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)); *see also* Dkt. No. 35 at 21.  However, the Second Circuit has noted that "[i]t is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith." *Id.*

Courts continue to "recognize that an allegation that a decision was motivated by a discriminatory animus is weakened when a decisionmaker is a member of the same protected class as the plaintiff." *Inguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212, 2014 WL 4678254, *18 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 Fed. Appx. 91 (2d Cir. 2015); *see also Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522-23 (S.D.N.Y. 2019 ("Although there is no presumption that employers will not discriminate against members of their own protected class, the fact that one of the key decision-makers is Catholic 'undermines any possible inference of discriminatory animus'") (quotation omitted); *Maynard v. Stonington Cmty. Ctr.*, No. 3:15-CV-483, 2018 WL 1633709, *6 (D. Conn. Mar. 31, 2018); *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015), *aff'd*, 661 Fed. Appx. 87 (2d Cir. 2016).

Courts also apply "[a]n inference against discrimination is appropriate when the individual hired to replace plaintiff alleging discrimination is within the same protected class as plaintiff." *Meyer v. McDonald*, 241 F. Supp. 3d 379, 391 (E.D.N.Y. 2017), *aff'd sub nom. Meyer v. Shulkin*,

722 Fed. Appx. 26 (2d Cir. 2018) (citing *Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115, 117 (2d Cir. 2010); *Rodriguez v. N.Y.C. Health & Hosps. Corp.*, No. 14-CV-4960, 2015 WL 5229850, *5 (E.D.N.Y. Sept. 8, 2015)).  "The inference is not dispositive, but plaintiff must overcome it in order to establish an inference of discrimination."  *Id.*; *see also Iguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212, 2014 WL 4678254, *19 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 Fed. Appx. 91 (2d Cir. 2015) ("While it is true that the Second Circuit has rejected the per se rule followed in other circuits that a plaintiff must demonstrate that she was replaced by a person outside the protected class, . . . the hiring of . . . a Hispanic woman, to replace Plaintiff[, a Puerto Rican woman] . . . severely undercuts Plaintiff's Title VII claim") (footnote and citations omitted).

    As alleged in Plaintiff's complaint, she was terminated by Woods, another female, and Plaintiff's department was absorbed by another department in which "two females in their thirties and one male in his early forties" continued their employment.  Dkt. No. 40 at ¶¶ 23. Because Plaintiff was terminated by a member of her own protected class and members of her own protected class took over her job duties, these allegations do not support an inference of discrimination.

    Plaintiff also alleges that, during an online meeting, a male colleague told Plaintiff she looked "awful" and "sick," but that "[m]aybe it is just the lighting."  Dkt. No. 40 at ¶ 70.  This comment does not give rise to an inference of discrimination about Plaintiff's sex.  Not only does Plaintiff fail to allege that the male colleague said anything concerning Plaintiff's sex, but courts have consistently concluded that comments made by other employees who did not play a role in a termination decision do not support an inference of discrimination.  *See, e.g.*, *Lioi v. New York City Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 586 (S.D.N.Y. 2012) ("[T]here is no evidence that Somma had anything to do with the decision to terminate [the plaintiff], nor that

his comments were in any way related to the decision-making process"); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 223 (2d Cir. 2004) ("Patterson produced no evidence that racial harassment at the hands of fellow officers had any bearing on the Department's decision to terminate his employment"); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 334 (S.D.N.Y. 2010) ("[T]he various derogatory statements that Plaintiff attributes to her co-workers do not give rise to an inference of discrimination because there is no evidence that these co-workers had any involvement in Plaintiff's termination").  Plaintiff has not produced any evidence that her male colleague's statement impacted Woods' termination decision.

For these reasons, Plaintiff has failed to allege facts that plausibly give rise to an inference of sex-based discrimination.  Defendants' motion to dismiss those claims are granted.

As to Plaintiff's disability discrimination claim, "'[a]s other courts within the Second Circuit have held, temporal proximity is sufficient to raise an inference of discrimination to plausibly state a claim of employment discrimination.'" *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015) (quotation omitted) (collecting cases). "Although there is no bright-line rule, 'where a plaintiff relies on temporal proximity alone, the protected activity and adverse action must occur "very close" together.'" *Gahfi v. New York City Dep't of Educ.*, No. 23-CV-1782, 2025 WL 675933, *12 (E.D.N.Y. Feb. 28, 2025) (quoting *Sealy v. State Univ. of New York at Stony Brook*, 834 Fed. Appx. 611, 614 (2d Cir. 2020)).  "'[A]dverse employment actions occurring approximately three months after protected activity are too attenuated to give rise to an inference of retaliation.'" *Id.* (quotation and citation omitted).  "The case law has generally treated, at the pleading stage, gaps of two months or less— between disclosure of a disability and an adverse action—as plausibly giving rise to an inference of causation in discrimination cases."  Kamiel v. Hai St. Kitchen & Co. LLC, No. 19-CV-5336,

2023 WL 2473333, *4 (S.D.N.Y. Mar. 13, 2023) (concluding that "an approximately five-week gap "permits a plausible inference of causation") (collecting cases).

Plaintiff alleges that around December 2022, "[d]ue to her arthritis, Plaintiff began to have difficulty keeping up and lagged behind the group. Woods continued to march the group ahead, making no effort to keep Plaintiff with the group." Dkt. No. 40 at ¶ 40. "Finally, when they reached the very end of the mall, Woods turned to Plaintiff and in front of all her colleagues, in a loud voice, broadcast to the group, 'What's wrong with you? Is there something wrong with your back?'" *Id.* Plaintiff told Woods about her arthritis and Woods "replied, 'Oh,' and walked off briskly with the younger men, leaving Plaintiff behind and alone." *Id.* at ¶ 41. Plaintiff contends that "[i]mmediately after the [] trip, after Plaintiff disclosed one of her disabilities (arthritis) to Woods, without warning or explanation, Woods excluded Plaintiff from all subsequent site visits and client meetings, further sidelining and isolating her, making it impossible for her to properly carry out her responsibilities." *Id.* at ¶ 42. Plaintiff was terminated on May 15, 2023. *See id.* at ¶ 82.

First, to the extent Plaintiff was termination nearly six months after Woods learned about Plaintiff's arthritis, that gap in time is too attenuated to give rise to inference of discrimination. *See Greenberg v. State Univ. Hosp. - Downstate Med. Ctr.*, 838 Fed. Appx. 603, 607 (2d Cir. 2020) (affirming summary judgment on sex discrimination claim because "the alleged remarks [were made] at least six months prior to Defendants' failure to promote Dr. Greenberg and at least ten months prior to the termination of his employment"; "Dr. Greenberg offers no evidence connecting the alleged remarks to any employment decisions that [were] made"; and the defendants "promoted several Jewish physicians during the relevant time period").

26

However, Plaintiff's claims do not relate solely to her termination. She alleges that she was repeatedly excluded from meetings and site visits which made "it impossible for her to properly carry out her responsibilities." Dkt. No. 40 at ¶ 42. Plaintiff contends that it was after she told Woods about her "arthritic condition," that Woods gave Plaintiff "a false negative performance evaluation." *Id.* at ¶ 43. Plaintiff's negative performance review occurred on January 6, 2023. *See id.* at ¶ 57. Plaintiff informed Woods about her arthritis approximately two weeks before Plaintiff was excluded from site visits and given a negative performance review. This is a plausible temporal connection between her disability and adverse actions.

Plaintiff states that she "does not rely *solely* on temporal proximity to establish an inference of discrimination." Dkt. No. 35 at 24. She asserts that she "offers other evidence to connect Woods' discriminatory remarks to adverse actions and her decision (or influence) to terminate Plaintiff's employment." *Id.* Plaintiff does not then provide a single fact alleged in her complaint that connects Woods' decisions to Plaintiff's disability.

"Circumstances contributing to an inference of . . . discrimination may include: Invidious comments about people in the protected [] class; more favorable treatment of [other] employees; criticism of an employee's work performance in . . . degrading terms; a sequence of events leading to an employee's termination; or the timing of the termination." *Brenner v. City of New York Dep't of Educ.*, 132 F. Supp. 3d 407, 420 (E.D.N.Y. 2015), *aff'd*, 659 Fed. Appx. 52 (2d Cir. 2016) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). Invidious "remarks about a protected class do not themselves give rise to an inference of discrimination . . . unless they are accompanied by other evidence of discrimination or a plaintiff demonstrates a 'nexus' between the remark and the adverse employment action." *Id.* (citing *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518-19 (S.D.N.Y. 2004)). "Relevant considerations include 'when the

remark was made in relation to the employment decision at issue' and 'the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).'" *Id. (*quoting *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010)).

"It is also appropriate to assess whether a reasonable juror would view the remark as discriminatory." *Id.* (citation omitted). "Where a remark is 'ambiguous' as to whether it 'reflects discriminatory animus' it is not sufficient to support an inference of discrimination." *Id.* (quoting *Mayling Tu v. OppenheimerFunds, Inc.*, No. 10-CV-4971, 2012 WL 516837, *7 (S.D.N.Y. Feb. 16, 2012)); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Plaintiff alleges that Woods asked Plaintiff, "What's wrong with you?  Is there something wrong with your back?"  Dkt. No. 40 at ¶ 40.  After Plaintiff explained her arthritis condition, Woods responded, "'Oh,' and walked off briskly with the younger men, leaving Plaintiff behind and alone." *Id.* at ¶ 41.  Plaintiff does not allege any facts that connect Woods' question or remark to the termination decision.  Plaintiff alleges that Woods called Plaintiff "unannounced" and conducted a performance review criticizing Plaintiff's work. *See id.* at ¶¶ 58-61.  Plaintiff does not allege that any of the criticism concerned Plaintiff's ability to meet the physical demands of her job or otherwise alluded to her disability.  Therefore, Woods' ambiguous question and remark, made six months prior to Plaintiff's termination are insufficient to give rise to an inference that Plaintiff was termination because of her disability.

In arguing that she has presented sufficient allegations to support an inference of discrimination, Plaintiff reiterates that Woods presented a document about PERMA's employees' ages, Woods told Plaintiff that the younger employees look at Plaintiff "and feel like there is no place to go," and a male colleague told Plaintiff she looked sick.  Dkt. No. 35 at 24-25.  None of these circumstances are connected to Plaintiff's arthritis or any other perceived disability.

Therefore, to demonstrate disability discrimination Plaintiff does rely solely on the close temporal proximity.  The only plausible temporal connection in Plaintiff allegations is that between her statement to Woods about her arthritis in December 2022—which impacted Plaintiff's ability to physically keep up with other employees—and Woods exclusion of Plaintiff from site visits immediately, thereafter, followed by a negative performance review.  Although the Court has reservations about the ultimate strength of this claim, courts have permitted discrimination claims to proceed beyond the motion to dismiss stage where the only support for such a claim is temporal proximity; therefore, the Court will allow Plaintiff's disability discrimination claim to proceed at this early stage.  *See Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015); *Shlafer v. Wackenhut Corp.*, 837 F. Supp. 2d 20, 27 (D. Conn. 2011); *Kamiel v. Hai St. Kitchen & Co. LLC*, No. 19-CV-5336, 2023 WL 2473333, *5 (S.D.N.Y. Mar. 13, 2023).

      Accordingly, the Court denies this aspect of Defendants' motion to dismiss.

      ***b. Retaliation***

      "'Retaliation claims under the ADA are analyzed using the same framework applied in Title VII cases.'"  *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 185 (S.D.N.Y. 2020) (quoting *Thompson v. City of New York*, No. 03-CV-4182, 2007 WL 4224370, *4 (S.D.N.Y. Nov. 21, 2007)).  "For a retaliation claim to survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) "because" he has opposed any unlawful employment practice.'"  *Sharikov v. Philips Med. Sys. MR, Inc.*, 659 F. Supp. 3d 264, 282 (N.D.N.Y. 2023), *aff'd*, 103 F.4th 159 (2d Cir. 2024) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2nd Cir. 2015)).  "Even if a plaintiff has not alleged that [s]he has a disability under the ADA, [s]he may still succeed on a retaliation claim if [s]he plausibly alleges that [s]he had a 'good faith, reasonable belief that the underlying

challenged actions of the employer violated [the ADA].'" *Id.* (quoting *Morey v. Windsong Radiology Grp.*, P.C., 794 Fed. Appx. 30, 33 (2d Cir. 2019)). "'The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances.'" *Id.* (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013)) (additional quotation omitted).

"A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90-91 (citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)). "With respect to causation, a plaintiff must prove that 'but for' the disability, the adverse action would not have been taken." *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (quotation omitted). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Vega*, 801 F.3d at 90-91. "'[B]ut-for' causation does not[, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)) (quotation marks omitted). "Further, 'the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity.'" *Id.* (quotation omitted).

On January 23, 2023, Plaintiff spoke with the Vice President of Human Resources, Jackie Hennessey. *See* Dkt. No. 40 at ¶¶ 70-71. Plaintiff alleges that she spoke to Hennessey "about the comments" that were made to her by a male colleague. *Id.* at ¶ 71. "Hennessey agreed that the comments 'were not appropriate' and admitted that there were a lot of things going on at PERMA that were not appropriate and with which she did not agree." *Id.* at ¶ 72. "Plaintiff asked Hennessey to close the door, and the two sat to discuss further. Plaintiff voiced her concerns

about her experiences with Woods, Woods' discriminatory treatment, and the inaccurate six-month review designed to discredit her." *Id.* at ¶ 73.  Plaintiff contends that Hennessy was unaware of Woods' review of Plaintiff's work.  *See id.* at ¶ 74.  "Hennessey again indicated that Woods had made decisions impacting staff with which she did not agree and confided that she had decided to start using a blunter approach with Woods, though it had not made any difference." *Id.* at ¶ 75.

Plaintiff alleges that "[a]fter her complaint to Hennessey, it was clear to Plaintiff that, even if her complaint was investigated or addressed, Woods was not going to change, and Hennessey was powerless to ameliorate the misconduct.  Nothing came of Plaintiff's complaint, and Woods thereafter retaliated against Plaintiff." *Id.* at ¶ 76.  Specifically, Plaintiff avers that Woods continued to exclude Plaintiff from meetings, spoke poorly about Plaintiff's job performance, and terminated Plaintiff.  *See id.* at ¶¶ 77-82.

Plaintiff argues in her opposition to Defendants' motion that "[a] juror also could conclude that Woods and the male colleague only refrained from making any other discriminatory remarks between January 23 and May 15, 2023 because HR *specifically coached them* on how to communicate with employees as the result of Plaintiff's complaint.  A juror also could conclude that Woods was instructed by HR or legal counsel not to fire Plaintiff too soon after she had lodged her complaint and waited for an 'opportune time.'"  Dkt. No. 35 at 29 (quotation omitted).

Plaintiff's retaliation claims are, again, based solely on temporal proximity.  However, Plaintiff's retaliation claims fare worse than her disability discrimination claims.  This is because although Plaintiff informed Woods about her disbaility, s*ee* Dkt. No. 40 at ¶¶ 41-42, there are no allegations that anyone informed Woods about Plaintiff's conversation with Hennessy.  Plaintiff has not alleged facts that demonstrate "that the adverse action would not have occurred in the

absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

There is no indication anywhere in Plaintiff's complaint that Woods, or any other PERMA employee with termination authority, knew about Plaintiff's complaint.  Without that, there can be no nexus, let alone but-for causation, between Plaintiff's conversation with Hennessey and Woods actions against Plaintiff.  The purported temporal proximity between the protected activity and Plaintiff's termination are insufficient to make Plaintiff's allegations anything more than speculative.  *See Bryant v. Greater New Haven Transit Dist.*, 8 F. Supp. 3d 115, 133 (D. Conn. 2014) (dismissing retaliation claim because a "suspension occurred more than six months . . . after filing his [] complaints") (citing *Chukwueze v. New York. City Emps. Ret. Sys.*, 891 F. Supp. 2d 443, 457 (S.D.N.Y.2012) (finding a temporal proximity of between three and six months between plaintiff's testimony at a co-worker's discrimination hearing and the adverse employment action "insufficient, standing alone, to establish a causal connection")); *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 609 (E.D.N.Y. 2013) (dismissing retaliation claim where the complaint did not "allege that defendant was aware of that protected activity or considered that protected activity in deciding to terminate plaintiff" nor "provide any factual allegations that could establish a causal nexus between her unidentified protected activity and any alleged adverse employment action").

This conclusion is supported by the fact that alleged adverse actions began before Plaintiff's conversation with Hennessey.  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001); *see also Dixon v. Int'l*

*Fed'n of Accountants*, 09-CV-2839, 2010 WL 1424007, *6 (S.D.N.Y. Apr. 9, 2010), *aff'd*, 416 Fed. Appx. 107, 2011 WL 1086867 (2d Cir. Mar. 25, 2011) ("[Plaintiff] was subjected to repeated critiques and complaints about her management and performance skills before she ever lodged any complaints about discrimination and, as such, her retaliation claim must be dismissed"); *Kiernozek v. New York State Dep't of Tax'n & Fin.*, No. 1:14-CV-0481, 2017 WL 5468321, *10 (N.D.N.Y. Mar. 10, 2017) ("[B]y the time Plaintiff filed the complaint, he had already received three evaluation reports, of which the latter two gave him a summary rating of 'Needs Improvement.' Thus, the process that led to his demotion had begun before Plaintiff engaged in the relevant protected activity"); *Beauchine v. City of Syracuse, New York*, No. 5:21-CV-00845, 2022 WL 561548, *12 (N.D.N.Y. Feb. 24, 2022).

Plaintiff alleges that "the conditions of her employment changed precipitously when Defendant Woods was appointed Executive Director and took over as Plaintiff's direct manager in or about January 2022." Dkt. No. 40 at ¶ 20. Plaintiff did not speak to Hennessey until January 2023. *See id.* at ¶¶ 70-72. Prior to her speaking to Hennessey, Plaintiff had already been excluded from meetings and given a poor performance review. *See id.* at ¶¶ 39-62.

Therefore, because Plaintiff alleges that Woods was engaging in discriminatory behavior before Plaintiff ever spoke to Hennessey and there are no allegations that Woods learned of Plaintiff's complaint of discrimination to Hennessey, Plaintiff has failed to raise an inference of retaliation. Therefore, Defendants' motion to dismiss Plaintiff's retaliation claims is granted.

## IV. CONCLUSION

Upon careful consideration of the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein it is hereby

ORDERS the Defendants' motion to dismiss (Dkt. No. 25) is **GRANTED in part and denied in part**; and the Court further

ORDERS that Plaintiff's sex discrimination claim and Plaintiff's retaliation claims (Dkt. No. 40) are **DISMISSED**; and the Court further

ORDERS that Plaintiff's age and disability discrimination claims (Dkt. No. 40) are permitted to proceed; and the Court further

ORDERS that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:  March 24, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge